UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SALEM7FS LLC D/B/A SALEM FOOD STORE, and AMJAD M. CHAUDHRY,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,[1]<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. 22-10184-LTS<br>)<br>)<br>)<br>)<br>) |

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 33)

March 25, 2024

SOROKIN, J.

Plaintiffs Salem7FS, LLC d/b/a Salem Food Store and Amjad M. Chaudhry seek judicial review of the United States Department of Agriculture's ("USDA") decision to disqualify Salem Food Store from participation in the Supplemental Nutrition Assistance Program ("SNAP") due to alleged trafficking of benefits. See Doc. No. 1.[2] In response, Defendant United States of America filed the pending Motion for Summary Judgment ("Motion"). Doc. No. 33. Plaintiffs opposed. Doc. No. 39. After a hearing on March 22, 2024 and careful review, the Motion is ALLOWED.

---

[1] The United States is the only defendant remaining, after an earlier order of this Court dismissing, without opposition from the Plaintiffs, the United States Department of Agriculture's Food and Nutrition Service as a defendant in this action. Doc. No. 10.

[2] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system. Pincites are to the page numbers in the ECF header.

I.  STATEMENT OF FACTS

Amjad Chaudhry owns and operates Salem7FS LLC, which does business as Salem Food Store ("Store"). Doc. No. 41 ¶ 18. The Store is a food market located at 126 North Street in Salem, Massachusetts. Id. ¶ 19. Since 1994, the Store has been authorized to participate in SNAP, which provides qualifying, low-income households with a monthly allotment of SNAP "benefits." Id. ¶¶ 5, 21; see 7 U.S.C. § 2013(a). As an authorized retailer, the Store can accept SNAP benefits as payment for eligible food items. Doc. No. 41 ¶ 6. SNAP participants receive an electronic benefit transfer ("EBT") card, which is linked to their SNAP account; the EBT card functions like a debit card and can be used to purchase eligible food items. Id. ¶ 5.

The USDA's Food and Nutrition Service ("FNS") administers and oversees the SNAP program. Id. ¶ 10. Various rules govern the SNAP program, including a prohibition on "trafficking," which is defined as:

> The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone.

7 C.F.R. § 271.2. As part of its oversight, FNS monitors the activity of <u>all</u> SNAP transactions in a national database, including the date, time, amount, store, and household associated with each transaction. Id. ¶ 11. In particular, FNS closely monitors transactions for patterns that suggest the trafficking of benefits. Id. ¶¶ 9-11. If FNS detects suspicious activity suggesting trafficking, a program specialist conducts an investigation; following the investigation, the program specialist makes a recommendation to FNS, which issues a determination.[3] Id. ¶ 13; 7 C.F.R. § 278.6. An

---

[3] If the program specialist's recommendation is that further action is warranted, a store receives a "charge letter" outlining the allegations and is afforded an opportunity to respond. 7 C.F.R. § 278.6(b). Only after this opportunity to respond will FNS issue its determination. Id.

aggrieved store may seek appeal to an administrative review officer. Doc. No. 41 ¶ 15. At the completion of agency review, if it is determined that a violation occurred, FNS is authorized to <u>permanently</u> disqualify a retailer from participating in SNAP. Id. ¶¶ 16, 17; see 7 U.S.C. § 2021(b)(3)(B) (allowing for the permanent disqualification of a retailer in response to a finding of trafficking benefits). A store may be permanently disqualified based on its first occasion of trafficking. 7 U.S.C. § 2021(b)(3)(B).

In April 2021, the Store became the subject of a trafficking investigation based on EBT transactions that occurred between December 2020 and April 2021. Doc. No. 41 ¶ 59. The transactions for the relevant time period reflected patterns consistent with trafficking. Id. On April 14, 2021, with the consent of a Store employee, an FNS contractor conducted an in-person visit to the Store to gather further information. Id. ¶ 60. Following the investigation, on June 21 2021, FNS issued Chaudhry a "Charge Letter" advising him of the investigation results and the agency's decision to charge the Store with trafficking. Id. ¶¶ 75–81; Doc. No. 32-5 at 2–4. The Charge Letter identified 332 EBT transactions indicative of trafficking. Doc. No. 41 ¶¶ 39, 44. The Charge Letter included two attachments, which listed all the transactions in question, along with the date, time, household account, and amount. See Doc. No. 32-5 at 5–15. These are the only transactions challenged by FNS. See id. The challenged transactions are split into two categories: (1) 50 sets (totaling 123 transactions) of transactions drawn from the same household account "within a set time period" ("Scan B2" transactions); and (2) 209 transactions that appeared excessively large "based on the observed store characteristics and recorded food stock" ("Scan F" transactions).[4] Doc. No. 32-5 at 2.

---

[4] FNS categorizes suspicious patterns of transactions into groupings it denominates as "Scan 'X'" transactions; Scan B2 transactions refer to "multiple transactions . . . made from the account of a single household within short time frames," while Scan F transactions refer to "conducted

3

On July 6, 2021, Plaintiffs submitted a written request for a civil monetary penalty ("CMP") in lieu of permanent disqualification. Doc. No. 41 ¶ 83.[5] On August 2, 2021, in their reply to the Charge Letter, Plaintiffs denied any involvement in trafficking. Id. ¶ 84. FNS denied Plaintiffs' request for a CMP and noted that Plaintiffs would be permanently disqualified from SNAP—effective immediately—unless they requested review by the Chief Administrative Review Branch of the USDA. Id. ¶ 87; Doc. No. 32-10 at 2. Plaintiffs sought agency review, and the Administrative Review Branch affirmed the permanent disqualification. Doc. No. 91. Plaintiffs then filed suit in this Court, requesting judicial review of the disqualification decision pursuant to 7 U.S.C. § 2023(a)(13) and (15). Doc. No. 1. Now, the Defendant moves for summary judgment in its favor. Doc. No. 33. The matter is fully briefed. See Doc. Nos. 33, 39, 42, 45.

II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2009) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). On issues where the non-moving party bears the ultimate burden

---

transactions that are large based on the observed store characteristics and recorded food stock." Doc. No. 32-3 at 13, 17.

[5] Plaintiffs received an extension of time to reply to the Charge Letter, but no extension to submit their request for a CMP. Doc. No. 41 ¶ 82. Thus, the request for a CMP was filed prior to Plaintiffs' reply to the Charge Letter. Id. ¶¶ 83, 84.

of proof, the non-moving party must present "'definite, competent evidence'" to rebut the motion. Mirabella v. Town of Lexington, 64 F.4th 55, 57 (1st Cir. 2023) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).

A party aggrieved by a final FNS determination "may obtain judicial review thereof by filing a complaint against the United States in the United States Court for the district in which it resides or is engaged in business . . . requesting the court to set aside such determination." 7 U.S.C. § 2023(a)(13). A court must conduct a de novo review to "determine the validity of the questioned administrative action." Id. § 2023(a)(15). However, this de novo review is limited to the USDA's determination that trafficking took place—not the agency's choice of sanction. Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). [6]

The burden of proving lawful conduct by a preponderance of the evidence rests on the store disputing the FNS determination, because a store "is in the best position to show what actually happens on its premises." Id. at 378. When the government agency introduces evidence of trafficking, summary judgment is warranted against a store if it "fails to identify 'significantly probative' evidence favoring [its] position." Id. at 377 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)). "While th[e] inference [of trafficking] is rebuttable, the allocation of the burden of proof dictates that the Store must point to some significantly probative evidence to rebut it (and, thus, fend off summary judgment)." Id. at 380. Although the First Circuit does not require "an opponent of summary judgment in SNAP benefit cases to raise a specific

---

[6] A court may only "disturb" the agency's choice of sanction "if it finds that choice to be 'arbitrary, capricious, or contrary to law.'" Irobe, 890 F.3d at 377 (quoting Mass. Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 520 (1st Cir. 1993)).

material issue in response to each alleged violation," "each set of violations must still be explained." Cheema v. United States, 365 F. Supp. 3d 172, 181-82 (D. Mass. 2019).

In evaluating evidence of trafficking, a "court may rely on circumstantial evidence created by EBT data." Id. at 181; see also Irobe, 890 F.3d at 380 (noting that the "cumulative effect" of circumstantial evidence can be "powerful"). Thus, this Court need not see direct evidence of trafficking to grant summary judgment for the government. Irobe, 890 F.3d at 380. In refuting the government's evidence to survive a motion for summary judgment, a store must provide "competent evidence, not merely conclusory allegations." Id. at 380 n.3. As noted by the First Circuit, generalized observations about a store and its customers' typical practices generally "lack force in the face of ample transaction data." Id. at 380.

## III. DISCUSSION

The Court has reviewed the entire administrative record de novo, including all of Plaintiffs' rebuttals, "giv[ing] no weight to the agency's finding that trafficking occurred." Irobe, 890 F.3d at 379. Even drawing all inferences in favor of Plaintiffs, as is required at the summary judgment stage, they have not persuasively demonstrated that a factual dispute exists. As addressed more fully below, the Court finds that the generalized explanations provided by Plaintiffs—that are not in any way tied to the specific data upon which the government relies—are insufficient in rebutting the Defendant's evidence of trafficking. The First Circuit has made plain in Irobe that such general assertions are simply not enough to withstand summary judgment. The Defendant's Motion for Summary Judgment (Doc. No. 33) is ALLOWED.

### A. Determination of Liability

In support of its determination of trafficking, the Defendant introduced 332 flagged transactions as statistical evidence, first identifying fifty sets of Scan B2 rapid-succession

transactions made from the same SNAP household.[7] Doc. No. 41 ¶ 39; Doc. No. 32-5 at 5-11. Of the fifty sets, five occurred in under ten minutes and another thirty-six occurred within a twenty-four-hour period. Doc. No. 32-5 at 5-10. Only nine sets occurred in a timeframe between twenty-four and forty-eight hours. Id. at 10-11. The Defendant argues that these transactions "amply demonstrate[] that Salem Food Store more likely than not engaged in trafficking SNAP benefits at least once" during the relevant time period. Doc. No. 34 at 13. In support of that finding, the Defendant points to the physical limitations of the Store—specifically, the Store uses a "single check-out counter with one cash register," making it unlikely that these transactions actually occurred. Id. The Defendant also directs this Court to three comparator stores located between 0.02 miles and 0.14 miles from the Store, each of which is classified by FNS—along with the Store in question—as a convenience store. Doc. No. 34 at 8; see Doc. No. 32-18 at 26.[8] None of these comparator stores engaged in any Scan B transactions during the relevant time period. Doc No. 34 at 8; Doc. No. 41 ¶¶ 50, 52, 54.[9]

---

[7] The fifty sets are comprised of a total of 123 transactions. Doc. No. 32-5 at 5-11.

[8] Amongst the seventeen categories of SNAP store types, FNS defines "convenience stores" as "[s]elf-service stores that offer a limited line of convenience items and are typically open long hours" that are "[p]rimarily engaged in retail sale of a variety of canned goods, dairy products, pre-packaged meats and other grocery items in limited amounts." Food and Nutrition Service, SNAP Store Type Definitions, (Nov. 14, 2023), https://www.fns.usda.gov/snap/store-definitions [https://perma.cc/5TJ6-B7G6]. Convenience stores also typically "sell a large variety of [SNAP] ineligible products; such as hot coffee, alcohol, or tobacco products." Id. Plaintiffs concede that the Store, and the comparators that the Defendant relies on, are all grouped by FNS as convenience stores. See Doc. No. 39 at 8-9, 20.

[9] Plaintiffs raise a challenge to two of the three comparator stores, urging that they are "gas stations with mini marts" and, as such, distinguishable from the Store in "size," "variety," and "volume." Doc. No. 39 at 20. These general assertions are unsupported by specific evidence, see id., and in the face of the concession that the comparators receive the same SNAP "convenience store" classification as the Store, id. at 8, Plaintiffs have failed to raise a material distinction. See Doc. No. 32-18 at 26. As for the third comparator, Plaintiffs do not raise any argument whatsoever challenging its status as a proper comparator. See Doc. No. 20. For the reasons addressed, the Court finds the argument attacking the similarity of the comparator stores unavailing.

7

In general support of its position that the flagged transactions constitute trafficking, the Defendant provides statistical data on certain households' shopping habits, casting further doubt on the validity of the transactions in question. As part of its ALERT Case Analysis Document, FNS prepared an analysis of individual households' SNAP transactions. Doc. No. 32-3 at 24-33. The first sample household had "41 of [its] 53 . . . transactions at the [Store] flagged." Id. at 25. Similarly, the second sample household had 19 of its 31 transactions at the Store flagged, id. at 30, while the third had 23 of its 27 transactions at the Store flagged, id. at 32. These three households alone contribute to a substantial share of the flagged transactions. Id. at 24-33. Notably, none of these three households had any flagged transactions at any other SNAP retailer, despite engaging in a meaningful number of purchases elsewhere (including purchases at other convenience stores). See id.

Plaintiffs deny the Defendant's finding that the first set of flagged transactions constitute trafficking, Doc. No. 39 at 11, and first argue that the suspicious activity can be explained by their customers' spending habits.[10] See id. at 13-15. For example, Plaintiffs surmise that "[f]requently a customer will make a purchase with an EBT card, then will leave the [S]tore, and then another customer will enter the [S]tore and purchase eligible food items with the same card," and "occasionally buyers engaged in two transactions, one after the other. Many times this could be for a family or household group who live together." Doc. No. 39 at 13 (emphasis

---

[10] While Plaintiffs dispute the FNS's characterization of Scan B2 transactions, Doc. No. 41 ¶ 37 ("Scan B2 transactions can be up to over 48 hours apart which is not 'a short period of time.'"), they do not dispute the fact that, during the relevant time period, the Store processed "50 sets of 'Scan B2'" transactions. Id. ¶ 39. Even considering Plaintiffs' argument that forty-eight hours is not an unusually short timeframe, the administrative record indicates that these types of transactions were rather uncommon for the Store. See Doc. No. 32-18 at 8 (demonstrating that there were only fifty sets of Scan B2 transactions out of a sample of 3,310).

8

added).[11] These arguments are underpinned by affidavits of customers attesting to their general shopping habits. See Doc. No. 39-5 (reflecting customers' claims that they "go into this store multiple times a day" and "do make . . . sometimes multiple [transactions] in a day"). Plaintiffs offer no evidence whatsoever specific to the Scan B2 transactions identified by the Defendant.

  The Court is unpersuaded by these explanations. As noted by the First Circuit, conjectural arguments about customers' shopping habits typically "lack force in the face of . . . ample transactional data," Irobe, 890 F.3d at 380, and Plaintiffs have not offered proof that meaningfully transforms their speculations into the type of evidence necessary to rebut the Defendant's data. See Cheema, 365 F. Supp. 3d at 183 (finding that a store's "submitted assertions from customers are too generalized to effectively refute the USDA's data"); Famous Int'l Mkt. v. United States, No. 17-4897, 2018 WL 3015249, at *32-33 (E.D. Pa. June 15, 2018) ("[T]he customers do not refute or provide detail on specific purchases at issue and do not provide detail corroborating the [m]arket's belief."); Justo R. Duchimaza & Cecilia's Mkt., LLC v. United States, 211 F. Supp. 3d 421, 435 (D. Conn. 2016) ("Plaintiffs' assertion that members of the same family would visit the store on the same day is simply a conclusion; Plaintiffs cite no examples, provide no data, and do not even attempt to account for the specific transactions the FNS identified in this category."). Because they fail to specifically account for any of the flagged

---

[11] In the absence of evidence that the second purchaser belonged to the same EBT household as the first purchaser (here, Plaintiffs lack such evidence, at most offering the assertion of the Store's owner that the second purchaser "could" be in the same household) this concession of consecutive transactions—made repeatedly by Plaintiffs, see Doc. No. 39 at 2, 13; Doc. No. 45 at 3—would further support the trafficking conclusion. Doc. No. 39 at 13; see 7 C.F.R. § 274.7(a) ("Program benefits may be used only by the household, or other persons the household selects, to purchase eligible food for the household."); 7 U.S.C. § 2016(b) ("Benefits issued to eligible households shall be used by them . . . .") (emphasis added). Because the Defendant did not argue this point, the Court merely notes the issue and declines to rely upon it in resolving the pending Motion.

transactions, the Court finds the customer affidavits offered by Plaintiffs to be too generalized to create a triable issue of fact.[12]

Plaintiffs next argue that the frequent transactions were caused by the fact that the Store is in a "densely populated part of the City of Salem" and is the "only 24-hour market in the area." Doc. No. 39 at 13. It is not entirely clear to the Court how being in a densely populated region would contribute to the frequency of transactions from the same SNAP household. Even assuming such a connection were established, one would expect that this phenomenon would also occur at the comparator stores, which are located in tight proximity to the Store but exhibited no Scan B2 transactions. Doc. No. 41 ¶¶ 50, 52, 54; Doc. No. 32-18 at 8. Nonetheless, even construing this argument in Plaintiffs' favor, it fails to create a factual dispute. Plaintiffs provide no further evidence linking the density of this particular area of Salem to the fifty sets (or, at the very least, one of the fifty sets) of suspicious transactions. Plaintiffs' argument about the Store's expanded hours relative to its geographic location fares no better. Without suggesting a causal relationship between the Store's hours and the flagged transactions, this statement is also insufficient to survive summary judgment. See Famous Int'l Mkt., 2018 WL 3015249, at *31-32 ("The Market's bald argument it processed more repetitive transactions because it remained open longer . . . fails. The Market does not adduce evidence its customers shopped more frequently at the Market because of its store hours.").

---

[12] Likewise, it is well established that the assertions themselves are insufficient to withstand summary judgment. See AJ Mini Mkt., LLC v. United States, 597 F. Supp. 3d 537, 540 (D.R.I. 2022) ("AJ Mini Market's cannot sustain its burden by surmising what its customers may or may not be doing or by making unreasonable and impractical speculations."); see also Irobe, 890 F.3d at 380 (finding the store's "generalized, non-specific observations about [its] customers' shopping habits" insufficient to fend off summary judgment).

Plaintiffs' final attempt to rebut the Defendant's statistical evidence of Scan B2 transactions is that many of the Store's customers have limited means of transportation. Doc. No. 39 at 13; see Doc. No. 39-5 at 4 ("I don't drive and this is the closest place for me to buy food."). In Irobe, the First Circuit was unmoved by a store owner's testimony that "customers sometimes arrived in large groups, due to limited means of transportation," noting that "generalized conclusions" "cannot fill the void" of evidence needed to survive summary judgment. 890 F.3d at 380-81. Here, in similar fashion, the customers' transportation limitations are too generalized of an explanation to raise a factual dispute, especially given the proximity of the three comparator stores, each exhibiting zero Scan B2 transactions. As addressed in the preceding paragraph, there is no evidence that the lack of transportation prompted these transactions. Therefore, in the face of the data provided by the government, "no rational factfinder could conclude that the Store had demonstrated by a preponderance of the evidence that the finding of trafficking was improvident." Irobe, 890 F.3d at 381.

The Court carefully considers the totality of all arguments posed by Plaintiffs and concludes that the weight of these explanations "comprise too flimsy a shield to deflect the swing of the summary judgment axe." AJ Mini Mkt., Inc. v. United States, 73 F.4th 1, 7 (1st Cir. 2023) (affirming the district court's entry of summary judgment for the United States); see also Suuqa Bakaro Grocery v. U.S. Dep't of Agric., No. 2:16-cv-254-DBH, 2017 WL 3141919, at *4 (D. Me. July 24, 2017) (noting, in granting the government's motion for summary judgment, that "the plaintiffs' explanations have made no reference to any specific transactions from the ample EBT transaction data reviewed by FNS"). Here, the evidence provided by the Defendant of rapid-succession transactions made by the same SNAP household properly supports an inference

of trafficking that Plaintiffs have failed to rebut.[13] The Store's failure to rebut the first set of violations is fatal to its position. Thus, on the first set of transactions alone, the Defendant is entitled to summary judgment in its favor. Even if that were not the case, the Court reaches the same result based on the second set of alleged violations.

The Defendant next identifies 209 unusually large Scan F transactions, each totaling $50 or more.[14] Doc. No. 41 ¶ 44. Five of those transactions were greater than $200, and twenty-nine were between $100 and $200. Doc. No. 32-5 at 12. The Defendant argues that these abnormally large transactions, taken in context of the Store's size, stock, and customer base, are strongly indicative of trafficking. Doc. No. 34 at 2. The Defendant further highlights the fact that transactions at the Store were "about 72% higher than the average SNAP transaction conducted at a convenience store in Essex County." Doc. No. 34 at 15 (citing Doc. No. 41 ¶¶ 33, 49). It is undisputed that the three closest comparator stores engaged in seven, six, and one Scan F transaction, respectively, during the relevant time period. Doc. No. 41 ¶¶ 51, 53, 55; Doc. No.

---

[13] Plaintiffs also have failed to direct this Court to caselaw that supports their proffered explanations. Indeed, in their papers, Plaintiffs provide scant authority for their arguments, citing to only two cases beyond those defining the summary judgment standard—one being Irobe. For the other, they briefly direct this Court to Mansour v. United States, No. CV F 08-1313 LJO DLB, 2009 WL 3763778 (E.D. Cal. Nov. 9, 2009). That case predated the First Circuit's Irobe decision by nearly ten years, and—as discussed at length herein—Irobe provides pivotal and controlling precedent on SNAP trafficking cases. The Court finds Mansour unpersuasive.

[14] Similar to the Scan B2 transactions, the Store disputes the FNS's characterization of the Scan F transactions, Doc. No. 41 ¶ 38 ("[C]haracterizing the defined transactions as unusually large is misleading."), but admits the fact that it "processed 209 'Scan F' transactions," id. ¶ 44. The Store's argument that classifying a $50 transaction as "unusually large" is "totally unsupported by any actual proof," Doc. No. 39 at 11, is unpersuasive. Plaintiffs cite no caselaw or statutory authority in support of this argument, nor is the Court aware of any cases where $50 was found not to be "excessively large" in analogous circumstances. Moreover, this number has not been subjectively applied; rather, it is taken in context of the Store's size, stock, and surrounding stores. Doc. No. 42 at 1-2; Doc. No. 41 ¶¶ 45-49; see AJ Mini Mkt., 597 F. Supp. at 540 (noting that a store's suspicious transactions data was "excessively large for the size of the store") (emphasis added).

32-18 at 6. Indeed, virtually all of Plaintiffs' following arguments (such as the spending habits of its EBT users, inflation, and the distance to supermarkets) would apply equally to these comparator stores, yet none of them engaged in a meaningful number of Scan F transactions.

Turning to Plaintiffs' rebuttal arguments, they first rely heavily on the spending habits of the Store's customers to vindicate their position—much like for the Scan B2 transactions. However, there are a few distinctive habits raised for this set of transactions. First, Plaintiffs allege that their credit system "<u>may</u> have caused some of the frequent or large transactions in question." Doc. No. 39 at 14 (emphasis added). As part of this credit system, "the [S]tore clerk offered food to some loyal customers on credit," and these customers "generally always pay the [S]tore back when they get money or money's worth on their EBT cards." <u>Id.</u> Plaintiffs also point to the "irresponsible behavior" of their customers. Doc. No. 39 at 15 (emphasizing that "[m]any EBT card holders treat their card as a credit card or debit card which is not money that they earned"). Nevertheless, Plaintiffs provide no specific evidence that would corroborate these assertions, and no specific evidence as to any of the flagged transactions.

General assertions about reckless shopping behavior do not create a factual dispute upon which a reasonable factfinder could find in favor of Plaintiffs.[15] <u>See</u> <u>AJ Mini Mkt.</u>, 73 F.4th at 8 (noting, while affirming the grant of summary judgment in favor of the government, that "[n]otwithstanding its assertion that customers shop in bulk once or twice a month, the Market has offered no evidence to support that assertion"); <u>see also</u> <u>Cheema</u>, 365 F. Supp. 3d at 186 ("Generalized statements claiming that entire SNAP allotments are spent on purchases of monthly supplies of meat is not sufficient to create a genuine issue of fact regarding these . . .

---

[15] Likewise, with respect to the credit system argument, the Store has failed to provide this Court with any evidence suggesting a correlation between the date of replenishment of EBT funds and the high-dollar transactions.

alleged violations."). As with Plaintiffs' previous attempts to corroborate the flagged transactions with customer affidavits, the Court finds them equally generalized. See, e.g., Doc. No. 39-5 at 3 ("I do make large transactions sometimes over $100.").

Next, Plaintiffs attempt to refute the Defendant's comparison of the Store to other, nearby stores. Doc. No. 39 at 20 ("[T]he convenient store comparisons relied upon by Defendant lack the requisite and relevant similarities to Plaintiffs' store, and are inapt and uninstructive."). Here, again, Plaintiffs have neglected to support their assertions with any proof. Consistent with the First Circuit's finding in Irobe, "the record is barren of any competent proof reflecting what inventory was carried by these other emporia." 890 F.3d at 381. Plaintiffs have not provided the Court with evidence indicating that the comparisons were flawed.[16] Another session of this Court has found that failing to provide data from other stores in an effort to legitimize flagged transactions is detrimental to a plaintiff's argument in a similar context. Cheema, 365 F. Supp. 3d at 187-88 ("Cheema's has not submitted evidence to show that the government's comparison to average sales at those stores was inappropriate."). As in Cheema, here, Plaintiffs have not supported their contention with credible evidence that the Store offers merchandise distinct from other markets in the Salem area—indeed, they have offered no evidence at all on this point. These unsupported explanations fail to gain traction against the Defendant's statistical data of nearby SNAP-participating food stores. See Irobe, 890 F.3d at 381 ("Irobe's unsupported

---

[16] Plaintiffs do point to a previous SNAP case that occurred in Lynn, Massachusetts, urging that the result there undermines the government's disqualification of the Store. See Doc. No. 32-4; Doc. No. 39 at 17-18. However, that case was not a comparator used by the Defendant, and this Court has no way to evaluate the strength of the comparison. Likewise, in the Lynn case, the store in question provided powerful evidence (including specific customer receipts and affidavits attesting to specific transactions) that is lacking here. Doc. No. 39-4 at 16-120, 165-84; cf. Doc. No. 45 at 2-3 (reflecting that, after the government highlighted this distinction, Plaintiffs disputed whether the store was "vindicated" while not addressing the substantive, evidentiary comparators). This case only underscores weaknesses in Plaintiff's evidence.

opinion about the limited availability of particular merchandise in the Lewiston area is simply not a game-changer in the summary judgment calculus.").

Plaintiffs also try to justify the unusually large transactions by relying on inflation, asserting that food and labor costs are higher than in years previous, and that there has been an influx of EBT funds, especially in the wake of the pandemic. Doc. No. 39 at 15-16; Doc. No. 39-6; Doc. No. 39-8.[17] However, in making this argument, Plaintiffs overlook the fact that this would cause a similar pattern of transactions at all similarly situated stores. Merely conjecturing about inflation or other sources of increased SNAP benefits provides no credible or specific proof that the 209 unusually large transactions at issue here were legitimate.

As a final attempt to rebut the Defendant's finding, Plaintiffs introduce invoices reflecting high volumes of vendor purchases in an effort to prove the Store's capability of completing the large transactions in question. Doc. No. 39 at 18. Nonetheless, demonstrating that the Store was able to complete large transactions does not actually endorse the position that trafficking did not occur in any one of the 209 flagged instances. In Irobe, the First Circuit struck down a similar argument from a store that had submitted receipts from vendors to prove the legitimacy of the transactions in question. 890 F.3d at 381 ("[T]he Store has made no showing as to how the amount of inventory reflected by the receipts relates to the total volume of the Store's sales during the relevant period."). The Irobe court went on to reason that, even if a store was legitimately buying SNAP-eligible products, that fact "does not insulate it from a finding of trafficking," because "[m]erchants may conduct legitimate business side-by-side with unlawful

---

[17] As evidence to support their proposition, the Store introduces two New York Times articles on pandemic-related increases in SNAP benefits. See Doc. No. 39-7; Doc. No. 39-9. However, this Court fails to see how either article, lacking reference to the present matter (or to any similarly situated store in Salem), provides evidence to rebut the Defendant's finding of trafficking.

trafficking." Id. Here, as in Irobe, the Store's vendor invoices fail to vindicate Plaintiffs' position.

As with the first set of transactions, the Court weighs Plaintiffs' arguments rebutting the unusually large transactions collectively and finds the sum total insufficient to survive summary judgment. Plaintiffs provide ample explanations surmising why the large transactions occurred. However, these generalized explanations fail to "meaningfully rebut[] the compelling inferences suggested by the agency's mass of circumstantial evidence." Irobe, 890 F.3d at 381. Therefore, the Defendant's inference of trafficking for this set of transactions has not been sufficiently rebutted by Plaintiffs.

Based on the foregoing, Plaintiffs have failed to raise any factual dispute that the Store did not engage in trafficking during the relevant time period.[18]

---

[18] The Court considers Plaintiffs' general argument that they were "severely prejudiced" by the government's delay in instituting action against the Store, and that it was "impossible . . . to track down transaction information." Doc. No. 39 at 12. This does not revive the Store's position. It wholly overlooks the fact that the Store bears the ultimate responsibility to prove that trafficking did not occur. Indeed, the First Circuit has noted that allocating the burden of proof to the Store "incentivizes shopkeepers to maintain accurate records of all SNAP transactions." Irobe, 890 F.3d at 378; see also Cheema, 365 F. Supp. 3d at 189 (noting that "bad record keeping . . . ignores the burden placed on [the store] at this stage in this proceeding"). The fact that the Store did not maintain trackable records of all purchases is not a compelling argument capable of insulating it from meeting its burden at summary judgment. The Court also notes that the Store was not subject to an unreasonably long delay prior to the government's investigation and final determination; the flagged transactions occurred between December 2020 and April 2021, an FNS contractor visited the store on April 14, 2021, and the Charge Letter was issued on June 21, 2021. Doc. No. 41 ¶¶ 59, 60, 75. In other words, once the transactional data reflected a pattern of irregularities, action was promptly initiated by the Defendant. In addition, of course, Plaintiffs could have taken the flagged transactions identified by the Defendant and, by way of discovery and investigation, provided evidence from its own records, or the customers themselves, to rebut the inference of trafficking. Plaintiffs offer no such evidence.

B.  <u>Choice of Sanction</u>

Finally, the Court turns to the USDA's determination to impose a permanent disqualification over a civil monetary penalty. Doc. No. 41 ¶¶ 91, 93. As noted, "[t]he de novo review standard applies only to the agency's liability determination, not to its choice of a sanctions." <u>Irobe</u>, 890 F.3d at 377. A district court may "disturb" that discretionary choice of sanction only if it is "arbitrary, capricious, or contrary to law." <u>Id.</u> Here, Plaintiffs have not presented this Court with evidence indicating that the agency abused its discretion in imposing a permanent disqualification.[19]

IV.  <u>CONCLUSION</u>

In sum, the Defendant has supported its Motion with relevant legal authority and persuasive evidence indicative of trafficking. Plaintiffs have opposed the Motion only by relying generalized assertions. Accordingly, the Defendant's Motion for Summary Judgment (Doc. No. 33) is ALLOWED. Judgment shall enter in favor of the Defendant with each side to bear its own fees and costs.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge

---

[19] In their initial pleading, Plaintiffs alleged that "[t]he decision to permanently disqualify Plaintiffs was improper, arbitrary, and capricious," and that "[t]he decision to deny Plaintiffs' request for a civil money penalty . . . was erroneous." Doc. No. 1 ¶¶ 28, 29. Plaintiffs do not raise any further arguments on the Defendant's choice of sanction in their briefs on the pending motion. <u>See</u> Doc. Nos. 39, 42.